The first is number 18-1376, Cobalt Boats v. Brunswick Corporation, Mr. O'Quinn. Thank you, Judge Steik. May it please the Court, John O'Quinn on behalf of Brunswick. I intend to focus much of my argument this morning on the District Court's claim construction and the improper damages award, but let me start first with venue. Thank you. After T.C. Heartland, there should be no reasonable dispute the venue was improper in the Eastern District of Virginia, and even the District Court seemed to acknowledge that in Appendix 678. Do we know what is meant by separate entity here as to whether that means separate corporation? My understanding, that's right, my understanding is that would be a separate corporate subsidiary. With respect to the entity that owns the warehouse within the district, my understanding is that it's a separate corporate entity, that it's not simply just a . . . Does the record show that? I'm not sure off the top of my head, Judge Steik, whether it does. I certainly can see if I can try to ascertain that today, if not . . . Do you know what's stored in the warehouse? Judge Raina, I don't know what is stored in the warehouse. There's a record, so there's no discussion. We don't know what's . . . it could be boat trailers for all we know. It could be. It could be any type of equipment. My understanding is that the warehouse is not related to the issues in dispute in this case, and that it is a separately owned entity, and if that's . . . Is there anything in the record that shows us that, because I think it's an interesting question. Well, I understand that it is. Now, that's obviously not the grounds on which the district court decided this, Judge Wallach, and so obviously that's potentially grounds for a remand, obviously, if the . . . I think that if the record demonstrates that what you're dealing with is a separate corporate entity, and I believe that it does, and I'll see if I can confirm that for you today, then the mere fact that a parent corporation owns a subsidiary operating in the district can't be enough to establish it under Supreme Court precedent. If venue isn't proper in the Eastern District, what authority from this court, as opposed to a bunch of others, says the remedy for a case tried in the wrong venue is vacateur? I think that's right, Judge Wallach. No, but what from this court, as opposed . . . I've seen lots from other courts. Sure. Sure. Well, I think that the authority from the Supreme Court, the Olberding case, 346 U.S. at 340, which reversed a jury verdict because it was tried in the improper venue, Lexicon v. Milberg Weiss, 523 U.S. at 41, saying reversal with a new trial is required where venue is precluded by a governing statute. So I think that's governed by Supreme Court precedent. But the case has to go the other way, too, right? I'm not aware of cases where you're dealing with improper venue in the sense of not a matter of convenience, but actually as a matter of law being improper, where the proceedings were allowed to stand. Because after all, as I think Judge Newman noted in her dissent when this issue was before this court in the context of the mandamus petition, the trial is certainly a very important aspect of venue. That is to say that having trial in the right venue is a large portion of what venue is all about. And I think that's certainly true here, where you have the patent-specific venue statute. If we decide to vacate based on venue, do we need to address any of the other issues at this point? Well, Judge Wallach, I think you can. And a different way of putting that is venue- We can do lots of things. The question was, do we need to? Well, I think it would be appropriate for the court to address the other issues. For starters, venue is not an issue like subject matter jurisdiction that goes to the power of the court. Indeed, there are courts, I'll give you an example, that have said that venue is not a mandatory threshold issue. So Hanley v. Powell Goldstein from the Second Circuit 2008, it's at 290 Federal Appendix 435 footnote 2, is a case where the court went on to reach the merits and reverse. And I think you could do that here, for example. I think it would be entirely appropriate to decide the claim construction and the infringement issue, and that actually would then moot the venue issue. Now, if you don't do that, then you would have to decide the venue issue. And I think that in so doing, it would certainly be appropriate for this court to give guidance, whether it is to the lower court in this case or the lower court that would ultimately- Advisory opinion? Well, I don't know that it would be advisory, Judge Wallach, in the sense that, again, since venue is not jurisdictional, these issues are all present and live before the court. And just like this court will decide an issue of infringement or invalidity and then reach out and decide the other, even though after having decided the one, it might not- I'm uncomfortable with sending it back to a different judge in a different jurisdiction and telling them that, well, this is from the top, this is how you do it, is because somebody may have done it wrong. You see what I'm saying? Well, I think, for example, it certainly wouldn't be unusual for this court to decide claim construction and tell whatever court would ultimately have this case, this is the or a appropriate claim construction. And similarly, I think that what happened here vis-a-vis damages is violation of every court has decided in the last decade addressing apportionment, the entire market value rule, the small assailable unit principle, and I think that this court would be- it would certainly benefit whatever court receives this case and district courts writ large to understand that from this court. Why don't you address the claim construction issue? Thank you, Judge Dyke. So turning to the issue of claim construction, the question is whether capable of being rotated 180 degrees means 180 degrees or something less than that. And I think it's important to note the claims here don't say about 180, and they don't use the kind of broadening language that this court has blessed for indicating an approximation. And as this court has said in generic, generic with a J, quote, without broadening words that ordinarily receive some leeway, the precise weight ranges do not avoid a strict numerical boundary to the specified parameter. And I think that similarly in U.S. Phillips, this court recognized that the use of ordinary numbers does not suggest an approximation. And that's what you have here is the use of ordinary numbers, 180 degrees, and the approach that is urged by Kobol- Is there anything in the specification that helps us understand the 180-degree limitation? It's not discussed in the specification. It's not discussed in the specification, Judge Dyke, and the reason for that is because this was added as an amendment to overcome prior art. And I think that even further demonstrates why it should be read strictly to mean what it says, 180 degrees. They specifically argued in order to overcome prior art that, quote, the prior art doesn't teach a step capable of being rotated 180 degrees, and that one piece of prior art taught away from a step being capable of being rotated 180 degrees, and that's at Appendix 980-981. And I think that in light of that prosecution history, it is especially appropriate to apply the principle articulated in generic and in U.S. Phillips and hold them to the number, because otherwise, if you don't, you will literally have vitiated the 180-degree limitation. Their argument is this is just an expression of flipping. Well, look at the claim language and just ignore the 180, and it's still an expression of flipping. It says, it would say, capable of being rotated between a stored position wherein said underside is exposed and a deployed position wherein said topside is exposed. The 180 would be doing no work. Both of those were added at the same time. They were added at the same time in the prosecution history to overcome prior art, some of which rotated less than 180 degrees. And of course, as this court said in Norian, there's no principle of patent law that the necessary to avoid a prior art reference that was the basis for a rejection. So I think it would be appropriate and indeed required by this court's precedents to hold them to exactly what they said during prosecution of the patent and not give them something less than that. There's also, of course, the fact that the district court here did not even engage in a proper claim construction, just applying a plain and ordinary meaning analysis. But I think that certainly we argued at claim construction and at other points in the case for this construction, and that issue is properly before the court. We don't have to worry about anything that's at 181 degrees. That's right. Because the idea is if it's... You've designed around, or you've tried to design around. That's right. I mean, rotating less than 180 degrees doesn't meet the claim limitation. If something is capable of rotating 180 degrees, then it could go more, just like if you're driving a car and it's capable of going 55 miles an hour, it means it's got to be able to go at least 55. Whether it can go 65, 75 is really neither here nor there. Were there opposing opinions posed by the experts before the jury as to the meaning of the 180 degree term? Well, Judge Reyna, I think that what ended up happening is exactly what this court has said in O2 Micro and in other cases where the experts ended up arguing effectively about claim scope in front of the jury as to what it would mean. And so, yes, you did have arguments in front of the jury about what this ultimately would mean. And the district court said very explicitly that he was leaving it for the jury. At Appendix 676, he said, quote, the experts differ on what he was referring to, 180 degrees, means. And I think the jury could differ on it. So I think that's an issue that's going to have to be resolved by the finder of fact. And similarly, at Appendix 3049, quote, I think the 180 degrees can arguably mean exactly that or not exactly that. Each side can take their positions on it. And that's, again, exactly what this court in O2 Micro and in Noblebiz has said that you're not supposed to do, which is allow the experts. O2 Micro, if I remember correctly, there was no jury instruction. In this case, there is a jury instruction. Well, there was a jury instruction as to plain and ordinary meaning. And that is the jury was instructed that it was plain and ordinary meaning. And with respect to the purported waiver argument that they make, which is not a waiver at all, it's just like what happened in PAP's licensing, shortly before the issue went to the jury, there were questions about clarifying the context of plain and ordinary meaning. And yes, we said that plain and ordinary meaning, the jury should be instructed that that means plain and ordinary meaning to a person of ordinary skill in the art with respect to all of the terms that he had construed to mean plain and ordinary meaning. And so certainly, the claim construction is not waived. And the fact that he told the jury plain and ordinary meaning is not enough for the reasons this court has said in O2 Micro. Now, if there are more questions on this. Your time is short. I'd like you to address, at least a little, the other side's damages expert. I would like to address it a little bit as well, Judge Wallach. I appreciate that. Because I do think that the award here violates principles articulated in cases like laser dynamics, vernetics, Erickson, and of course, most recently, power integrations. Because the expert did exactly what this court has said you cannot do in a jury trial. And they say this in their brief at page 54. That is, use the, quote, profit margin of the boats sold with swim steps rather than the swim step alone. And the methodology that they use does not attempt to determine the incremental value of the patented features compared to the countless non-patented features. Instead, it starts literally with the entire market value of boats. And then says, well, we're going to use 100% of the value of boats for 29% of boat sales. And by its own terms, those 29% are merely sales that were influenced by the swim step, not even that the swim step alone resulted in those steps. And you can see that at appendix 2356 to 57. And they used this number, this 29% of the entire value of the boat, to come up with a high end for a range that they put in front of this jury of 5,400, and precisely to skew the damages horizon. And you can see them laying out the range using 29% of entire boat value at appendix 2671. And that is exactly what this court has said that you cannot do in Laser Dynamics, in Ericsson, and of course, most recently, in Power Integrations, where the court said, quote, where multiple component products are accused of infringement, the royalty base should not be larger than the small assailable unit embodying the patented invention. And this is the situation exactly that was contemplated in the Commonwealth Scientific case or the Syro case, where you have a damages model that, quote, apportions from a royalty base. And if you're apportioning from a royalty base, quote, the model should use the small assailable patent practicing unit as the base. And they didn't precisely in order to be able to try to claim a piece of the boat and to put in front of the jury a theory that was 10 times their own profits when it came to swim steps, didn't even try to apportion down to the specific patented feature of their particular swim step. Now, I see I'm well into my rebuttal, but I'm happy to answer further questions. I'll give you two minutes for rebuttal. Thank you, Judge Stein. Have you tried some? Thank you, Your Honor. Please. If we wanted to, would we be able to decide the venue issue here? Or is that something that we should send back to have the court review anew? Judge Rainey, you can decide the venue issue here. The record supports venue under the patent statute 1400 to address Judge Dyke's question about the separate entity in the warehouse issue. If you look in the record at appendix 152, Mr. Anderson's declaration, paragraph 15, he does call it a separate entity. The record is silent on whether it's a subsidiary. But if you look at paragraph 16, whenever he wants to call it a subsidiary, when he's talking about a separate Brunswick entity, CRA, he does say a wholly owned subsidiary. The distinction that Brunswick is trying to make in their briefing with the warehouse that's in the district that's wholly owned by the defendant under CRA Factor III is that the boat group, which is the group that's responsible for designing the infringing boats in this case, or swim steps, doesn't do business in the district. But that puts another requirement into the venue statute when you're trying to figure out what a regular and established place of business is of a defendant. You're adding an additional requirement, which would then be a regular and established place of the defendant, by which the business unit within that defendant has conducted the infringing activity. And that's just not the requirement. Well, you're drawing a distinction between paragraphs 15 and 16. But one of them says, and it seems to be what you're talking about is whole ownership, but one says a separate entity owned by Brunswick, and one says a wholly owned subsidiary of Brunswick. How does that distinction work? Well, it shows that whenever they want to determine whether it's a subsidiary versus just merely a division or another entity, which the record is silent on when you're talking about the warehouse, they knew how to make that distinction. They know that they made a distinction between a wholly owned subsidiary, and a subsidiary is a specific entity. It is, it is. And a different kind of entity. It is. And the record in this case, one is silent on what the warehouse is. There's no doubt that under Cray Factor III that it's owned by Brunswick. It's a place of the defendant, and that they're doing business there. If it's a separate subsidiary, that isn't sufficient for vending, right? I don't agree. Really? What possible case can you cite to support that proposition? They are conflating the jurisdictional analysis with the venue analysis. Brunswick relies on the Cannon case from the Supreme Court. What case suggests that the fact that a separate subsidiary is doing business in the district, as a regular place of business in the district, is sufficient for vending? The only cases I have, Your Honor, are not from this court and our district court opinions in the copyright context. Whenever they're talking about subsidiaries sufficient to establish venue for the copyright statute, the Southern District of New York. But in this context . . . You don't contest that Brunswick's incorporated in Delaware? No. No. There's no issue about the first part of 1400B. We're talking about regular and established place of business. Specifically, Cray Factor III. The reason that the Cannon authority that they cite is inapplicable here. One, it's a Supreme Court case from 1925, well before the patent venue statute was created. Two, they're dealing with issues of jurisdiction there. In Cray, this court cautioned about conflating issues of jurisdiction and patent venue. I'm not understanding. The Supreme Court has said that if there's improper venue after a trial, that's a ground for setting aside judgment, right? Yes, but in this instance, 1400 has to be read in connection with 1406, which is what this court advised in Micron and it's something that Brunswick doesn't consider in their briefing or in their argument. I don't understand what you're talking about. Are you saying there's a waiver here? I'm trying to say there is a waiver under 1406 and that the court had the inheritance . . . Was there a waiver? Under 1406, so the Supreme Court in Dietz says that the court does not have the inherent power to deprive a party of its statutory rights. We agree with that. However, the statute 1406, which is a statutory right, says that nothing in this chapter shall impair the jurisdiction of a district court of any matter involving a party who does not interpose timely and sufficient  Micron. How were . . . they made an . . . when they answered, as I recall, when they answered the complaint, they objected to venue. Is that not correct? Yes. Okay. Yes, it is correct? Yes, Your Honor. Okay. When the Supreme Court came down, within what, a day they notified the district court? I don't know. Then they filed their motion within . . . It was three days. Three days. Yes, Your Honor. They very quickly filed their motion. Yes, Your Honor. And then the district court said, no, no, it's not retroactive. And then when we came down and said, yes, it is retroactive, they notified the court again. And at that point, the court said, waiver because you've dithered. And it lists the three things I've just talked about, that you objected to venue when you've answered the complaint. And then you filed these two venue motions. How is that waiver? Your Honor, the statute talks about timely and sufficient. And we're on the eve of . . . Well, how is it not timely? They did it in the eyes of lawyers and the law instantly. Your Honor, I don't dispute that they moved quickly. And I think you have to look at the circumstances of this case, a case that is on the eve of trial, one of the first cases after T.C. Hartline. So what? The Supreme Court comes down, and then we come down. I don't care if it's in the middle of trial. If a superior court enters a precedential decision, which is binding on the district court, are you saying that the district court can appoint in time, simply ignore it? No. No, I'm not, Your Honor. But I'm saying at the time, the court did not have the benefit of this court's In re Micron decision. It did when it ignored In re Micron? Well, the court in that case, though, says . . . Well, Micron doesn't suggest that you can find waiver just because it's on the eve of trial, does it? There has to be some delay in addition to this being on the eve of trial. Isn't that correct? Micron is silent on the issue. Micron, when they remanded the case back, the court didn't remand for consideration only under 1400. They didn't remand in order for the court to transfer. So you agree that Micron does not hold that just because it's on the eve of trial, you can find a waiver if they were otherwise prompt, right? I don't know if Micron goes that far. I think Micron leaves open the question of considerations that the court can, under 1406, factual considerations to determine whether a transfer should be denied. A 30-day delay, you know, six months before trial might not be significant. A 30-day delay six weeks before trial might be significant. In that sense, you can take account of how near the trial is, but you've got to find some delay, some undue delay. Like Judge Wallach, I'm having difficulty seeing where the undue delay was here. I think that it goes to the timely and sufficient aspect of the statute under 1406. And two weeks before trial, considering 1406, Federal Rule of Civil Procedure 1, where litigants should be given a just and inexpensive determination of their dispute, that is a timely . . . is perhaps on the facts of this case, something that the court in its discretion decided that it could not transfer the case. Why don't you talk about your damages issue? Yes, Your Honor. Because I think you have some real problems with that. On page 55 of the red brief, you say, Mr. Wallach, not Wallach, Mr. Wallach's estimate that the swim step generated 25 to 33 percent of boat sales was based on substantial evidence, including information Mr. Wallach received as Cobalt's chief financial officer from salesmen, independent dealers, and customers. Is that hearsay? No, Your Honor. Why not? He is a layperson. He is the executive of the company. He had personal interaction with the dealers. He had interaction with the sales team. Are other court statements being asserted for the truth of the matter contained therein? That is the definition of hearsay, Your Honor. Yes, it is. I agree with that. So it is hearsay. Then the question is, is there an exception? Well . . . Do you agree it's hearsay, or do you say it's not? Yes. No, I agree it's hearsay, Your Honor. Okay. Is there an exception? And if so, what is it? Does he have any business records to reflect those conversations? He did not. That is not in the record here, Your Honor. The two points that were made by Mr. O'Quinn, one on the entire market value rule issue, Cobalt's expert very clearly here invoked the Georgia-Pacific factors and apportioned the rate, just like this court said you could do in X mark to reach his conclusion. He systematically walked through each of the Georgia-Pacific factors. He tied the factors to the evidence and unlike the expert in X mark, Mr. Hoffman, Cobalt's expert, he said the net effect of each factor up or down on the rate . . . X mark is the long mark, right? Yes, Your Honor. But there the patent was on the entire item. Here, the patent is only on the step. That's the problem. I think that reads too much into X mark as being a requirement. The court there notes that that's why having the entire lawnmower as the SSPPU is a reason for it being appropriate. But here, the claim also . . . The patent is not usable unless it's on a boat. The claim says a retractable step for use with a boat in water. The claim limitations talk about taking the step and rotating it above the surface of the water to below the surface of the water. The step by itself . . . Does the boat work without a step? The boat works without the step, but the step doesn't work without the boat. And that's why the boat is the SSPPU. Could you address the claim construction issue? I find your suggestion that there was a waiver of the claim construction argument to be somewhat misleading. At the Markman hearing, they specifically urged the claim construction that they're urging now about the 180 degree limitation. What basis do you have for suggesting that they gave that up later on? Yes. They did raise it right at the Markman hearing, right? Yes, Your Honor. And the judge ruled against them. He said, I'm not going to do that. I'm going to say plain and ordinary means. You're right, Your Honor. And I don't disagree that once you raise something in a Markman hearing, you don't have to keep raising it again to preserve your right to object. So there's no waiver here? No. Yes or no? There is a waiver. There's invited error. And here's how we get there. Here's how we get there. At the jury instruction conference, sensing that there might be a dispute on this issue, Cobalt's counsel specifically raised and cited O2 micro to the court and said, Your Honor, we may be heading down a path that we shouldn't head down. There's an O2 issue here regarding this 180 degree limitation term, Appendix 3200 to 3201. And I encourage the court to don't take my word for it. Don't take Brunswick's word for it. Please take a look at it. Cites the case by name. Goes on a little further and then says, but I don't know if Brunswick thinks we have an O2 issue. Brunswick's counsel gets up and distinguishes the current situation here from an O2 situation and then engages in a dialogue back and forth with the clerk to amend the construction and then says after the amendment is adopted by the court, Brunswick's proposal says, so I think we can resolve this dispute by saying, and that's at the appendix at 3202, gives a proposal and the court agrees and Brunswick agrees that that resolves the dispute. Well, dispute about the plain and ordinary meaning instruction, not the dispute about whether there should be a 180 degree limitation instruction. Well, they were arguing for a construction for 180 degrees that means at least 180 degrees. There was a dispute about whether the term needed to be constructed, which is their O2 argument. Let me ask you a couple of questions. One, is the value of the swim step equivalent to the value of the boat? It's not the same, no, Your Honor. Second, on page 36 of the red brief, you say, I'm trying to do a little housekeeping here, you say, as this court has stated, and I'm going to insert, the district court rightly found forfeiture under its inherent power, that ruling was not unreasonable or an abuse of discretion, period. No citation. To what were you speaking? Because I couldn't find anything there where we said that. Bottom of page 36, last sentence. See what I'm saying? But you don't cite anything. We don't cite anything. So where did we say that? I believe it's intended to refer to the mandamus petition, in re si re, where the court ruled that the judge shouldn't have tried to... But of course we didn't have the benefit of later law, did we? No, Your Honor, you did not. Your Honor, I see that I'm over time. You're not going to sit down because there's still questions. On the claim construction issue, if we get past the question of waiver, we hold that there's no waiver, why is it that the appellant's claim construction isn't correct under the generic case? This is not an about limitation. It's a specific limitation. Why shouldn't we read it as a specific limitation? Two reasons. One, as you correctly noted earlier, the specification is silent as to 180-degree limitations. When you look at the intrinsic record here, the claim amendment was added during prosecution in connection with a topside and underside limitation. This is not like a chemical case, generic, where you've got claimed ranges and concentrations in a specification and you're trying to talk about the most effective concentration of a chemical. This is a simple case where you had a step and you've got prior art where a step goes from horizontal to vertical. But essentially you're asking us to construe it as though the language was about 180 degrees, right? I'm asking you to construe it as it means to flip and whatever 180 degrees would mean to one of ordinary skill in the art. Why isn't Mr. O'Quinn right that you could delete 180 degrees from that language and it would still mean to flip? So is that just extraneous language? No. The step, the topside and the underside limitations were added to distribute wear and tear on a step. But they show flipping, right? They require flipping. The topside and the underside? Yes. They require flipping, but they don't necessarily show how that's going to be done. The topside, the step could go from here to here.  Verbalizing. Oh, I'm sorry, Your Honor. It could go from a horizontal upward facing position to below the surface of the water where the topside remains the same. But here the step has a topside that becomes an underside and vice versa as the step is moved from the stored to the deployed position. And this court has also said... But if we construe this as the flipping limitation being there without the 180 degree language, doesn't the addition of the 180 degree language become significant? It shows how the step is moving from a stored to deployed. The topside and underside limitations show the interchangeability of the topside and the underside. I understand, but if you wanted to have 180 degrees mean about 180 degrees, why didn't you say so? It could have been drafted better. I don't dispute that, but from the context of the... If we had it at 270 degrees, kept going, it wouldn't work, would it? No, and that's not the context of the invention. If you had it at 90 degrees, it wouldn't work, right? No. Okay. So you could have said about 180, but didn't. You specifically said got them completely flat. Yes, in the context of the invention, it flips over. To be exactly 180 degrees? No, Your Honor. From the position at which it was then standing. I think that ignores the evidence in the record, in the intrinsic record, and reads too much into the amendment of the 180 degrees, which is distinguishing from art that has a step that goes from horizontal to vertical. Yeah, I mean, I'm concerned with the actual real world issue there. If it was at 175, it'd be a slight slope, and if it was at 185, it'd be a slight slope, and that might be dangerous. We don't know. It says 180, and we can at least presume there's a reason for that. And, Your Honor, the evidence in the case, as one of ordinary skills in the art would understand the term, whenever the step is on a boat and the platform is there, the platform sits down at a little bit of an angle in the water, and the rotation, depending on how the step is mounted on the boat with the platform, is not going to be a perfect 180 degrees, because when you put these things in the water, they sag a little bit, and that's what one of ordinary skills in the art, Mr. Dyer, testified about. It's what Mr. Berman testified about in the appendix at page 2773, talking about the varying angles of the step as the boat sits on the water. Well, that's just an argument you should have written it differently. It's not an argument that a specific reference to 180 degrees should somehow mean about 180 degrees when you didn't use that language. It's an argument that one of ordinary skill in the art in the context of this invention, and the intrinsic record of this case would understand the 180 degrees to mean to flip it over, or about 180 degrees. Going back to the venue issue, your opponent, Mr. Quinn, says that if we were to send it back for a venue decision, that we could nonetheless decide some of these other issues. What's your view on that? If you send it back to the venue, send it back to the district court for the venue, you could decide some of these other issues? I think the court certainly could. But if you send it back to a venue, I guess it just depends on how the court sends it back. Sends it back with considerations under 1406. So we vacate. You vacate. And we say, wrong venue. The question is, do we tell the new court, wherever they are, Delaware or wherever, here's our instructions about how to decide this case? That's the question you're going to ask. Your Honor, I'm sure the court certainly could. I don't have any good authority for you right now to determine whether you should do that or not. Okay. Thank you. Your Honor, thank you very much for your time. May I briefly conclude? No, I think we're out of time. Thank you. Thank you. Mr. O'Quinn. Thank you, Judge Dyke. Judge Rano, with respect to your last question, again, this is not a steel code situation where it's a question of the court's jurisdiction. You can decide the claim construction and the infringement issue. And if you do, that would moot the venue issue. In addition to the Second Circuit case that I cited, let me also – for further proceedings where we've provided claim construction or other guidance. Absolutely, Judge Dyke. Absolutely. And the only thing I was going to do was refer you – there's a Ninth Circuit case that assumed personal jurisdiction much in the same way, vis-à-vis venue, SMEMA versus U.S. Air Force, 147F3rd, 1148 at footnote one. Turning to the dispute at the charge conference that my colleague was referring to, as Your Honor noted, Judge Dyke, the dispute was over the plain and ordinary meaning construction. They were suggesting glomming some things onto that. We didn't agree with the things they wanted to glomm on. We offered a different suggestion of things to glomm on. But that – we never waived or gave up the argument that we made about 180, what 180 should mean. And, of course, the district court knew that. The district court said that at Appendix 10, that there was no waiver here. And the district court, if you look at the charge conference in context, starts out at Appendix 3187 saying, I'm not going to define 180. As I said before, that's a matter on which the experts disagree, and both sides can argue their case, but I'm not going to amend my definition. So that was the context in which that discussion was taking place. With respect to the limitation here, Judge Dyke, they are trying to turn the 180 into about 180. They didn't claim about 180. And, indeed, this court has said in cases like Quantum Corp. versus Rotimi, 65 F3rd 1577, this court has invalidated patents that came out of a re-exam where parties have added terms like approximately or about in front of a numerical limitation precisely because it was broadening. And that's what they're trying to do here during claim construction, having surrendered that territory during prosecution of the patent. One final point with respect to the venue issue, and that's this. The argument, of course, the argument about waiver is inconsistent with this court's en banc decision in Forshee versus Principi, where this court held, quoting the D.C. Circuit, that appellate courts will consider an issue not even raised at trial where a supervening decision has changed the law in appellate's favor, and the law before that was so well settled at the time of trial that any attempt to challenge it would have appeared pointless. And that's 284 F3rd at 1356. Thank you, Judge Duggan. Thank you. Thank both counsel. The case is submitted.